Norris Eugene MOSS, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 3–84–319–CR, 3–84–320–CR
and 3–84–321–CR.

Court of Appeals of Texas,
Austin.

Feb. 12, 1986.

Don Ervin, Houston, for appellant.

Charles E. Lance, Co. & Dist. Atty., Cameron, for appellee.

Before POWERS, EARL W. SMITH and BRADY, JJ.

EARL W. SMITH, Justice.

Appellant Norris Eugene Moss was charged in separate indictments with the offense of arson, in starting a fire, intending thereby to destroy four church buildings in Milam County: in District Court Cause No. 16,508, the Zion Hill Baptist Church; in Cause No. 16,509, the Stephens Chapel A.M.E. Church; and in Cause No. 16,510, the Perry Memorial Church of God in Christ. Tex.Pen.Code Ann. § 28.02(a)(4) (Supp.1986). The fourth indictment, in Cause No. 16,511, was dismissed on motion of the District Attorney during trial. The cases were consolidated for trial. In each of the cases, appellant entered a plea of "not guilty by reason of insanity," and was found guilty by the jury in each case. The court assessed punishment in each case at confinement in the Department of Corrections for seven years; the sentences to run concurrently.[1] Appellant's sole contention

---

1. On September 15, 1983, appellant was found incompetent to stand trial and committed to the Rusk State Hospital. Tex.Code Cr.P.Ann. art. 46.02 (1979). The original record on appeal contained nothing to indicate whether Moss was discharged from Rusk Hospital after his commitment, or whether he was found competent to stand trial by determination of the court or by

on appeal is that the verdict of the jury is "contrary to the great weight and preponderance of the evidence [which shows] that appellant was insane at the time of the offense." The affirmative defense of insanity, at the time of the commission of the offenses on July 4, 1983, was defined in § 8.01 of the Texas Penal Code as follows:

> (a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of mental disease or defect, either did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated.[2]

1973 Tex.Gen.Laws, ch. 399, § 8.01, at 896. The cases were tried under the definition of insanity as it existed on July 4, 1983. We affirm the judgment of conviction.

■ The proper standard of review to be used by this Court in criminal cases *in general* is to view all the evidence in the light most favorable to the verdict, limiting our inquiry to whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt, considering all the evidence in the case, resolving all conflicts and all reasonable inferences in favor of the verdict. *Jackson v. Virginia,* 443 U.S. 307, 318–319, 99 S.Ct. 2781, 2788–2789, 61 L.Ed.2d 560 (1979); *Van Guilder v. State,* No. 899–84 (Tex.Cr.App., November 6, 1985) (not yet reported); *Wilson v. State,* 654 S.W.2d 465, 471 (Tex.Cr.App.1983).

In all affirmative defense cases, the burden of proof is shifted to the defendant who must prove his defense by a preponderance of the evidence. Tex.Pen.Code Ann. § 2.04(d) (1974). In *Van Guilder v.*

*State, supra,* the Court of Criminal Appeals held that this burden is very different from that required of all other defenses that are not specifically defined as affirmative defenses in the Penal Code. In such other defenses, the burden of producing evidence shifts to the defendant; however, after he has met this burden of production, the State must disprove the allegation beyond a reasonable doubt. Tex.Pen.Code Ann. § 2.03(d) (1974). This level of proof is *not* required of the State in affirmative defenses, the court said, and then set out the standard of review in affirmative defense cases:

> [I]n reviewing a case involving an affirmative defense, the ocurt of appeals must review the evidence on the affirmative defense by looking at the evidence in the light most favorable to the implicit finding by the jury with respect to such affirmative defense and then determine, by examining all the evidence concerning the affirmative defense, if any rational trier of fact could have found that the defendant failed to prove his defense by a preponderance of the evidence. The court of appeals is limited in its review using this preponderance standard to evidence submitted on the issue of the affirmative defense in question. This review is called for when the defendant is contesting the sufficiency of the evidence to support his conviction because of his assertion that he adequately proved his affirmative defense.... There must be no reweighing or reclassifying of the evidence by the appellate court.

*Van Guilder v. State, supra,* slip opinion at 6; *See Baker v. State,* No. 135–85 (Tex.

---

jury verdict. *Id.* at § 5(i). By our order of December 18, 1985, under the authority of *Schaffer v. State,* 583 S.W.2d 627 (Tex.Cr.App. 1979), we abated the appeals for a judicial determination regarding appellant's competency to stand trial in these causes at the time he was tried. By a supplemental transcript, the trial court found that the court had properly sent copies of the report by the head of Rusk Hospital (dated March 8, 1984) finding Moss competent to stand trial to the attorneys as required under art. 46.02, *supra,* and that no objections to the report had been made. The court then

found that Moss was competent to stand trial at the time he was tried, as authorized under art. 46.02, *supra.*

2. Section 8.01 was amended by the Legislature in 1983, effective August 29, 1983 to read:

> (a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong. Tex.Pen.Code Ann. § 8.01 (Supp. 1986).

Cr.App. January 15, 1986) (not yet reported), in which the court said:

> [W]e have rejected the argument that the Texas Constitution and the Code of Criminal Procedure confer jurisdiction on the Courts of Appeals to consider great weight and preponderance of the evidence fact questions in cases involving the affirmative defense of insanity.

*Baker v. State, supra,* slip opinion at 2 (citing *Van Guilder v. State, supra*).

Appellant's single ground of error asks this Court to apply the prohibited "against the great weight and preponderance of the evidence" test. This, of course, we cannot do, and the ground of error probably is without merit. Since this case was docketed in this Court prior to *Van Guilder* and *Baker,* however, we will treat the ground of error as properly assigning the correct standard of review and review the evidence in that light.

## APPELLANT'S EXPERT EVIDENCE ON INSANITY

Moss presented one witness, Dr. Bacon, a psychiatrist. Dr. Bacon did not testify; but rather his psychiatric evaluation of Moss was admitted as evidence by stipulation, and was attached to the statement of facts as Defense Exhibit 3. The report is based on Dr. Bacon's interview with Moss conducted on June 11, 1984. The report begins by summarizing the interview. Moss understood that he was there to see if "he was competent at the time of the church fires." He remembered one fire, but not all of them. He admitted setting one of the churches on fire. He said that he was acting under God's will and that to understand his actions one must realize that he is the reincarnation of the Holy Roman Emperor and that his reason for burning the church was to call attention to that fact. His genealogical and historical research had led him to the conclusion that he was the "next Black Messiah."

The report next gives Dr. Bacon's diagnosis of Moss' condition. His opinion was that Moss was delusional and suffered from impairment of "reality testing." He had a paranoid thought disorder at the time of the examination and had been under the influence of this illness at the time of the fires, and had been incapable of conforming his conduct to the requirements of the law.

Attached to the report was a psychologist's testing report concerning the results of the Minnesota Multiphasic Personality Inventory. This test showed Moss to be normal and did not show him to be paranoid. The report noted that Moss was on anti-psychotic drugs at the time of the test, which might be responsible for the test showing him to be normal. This report is dated June 28, 1984. Dr. Bacon's report is based on an interview of June 11, 1984, when Moss presumably was on the same anti-psychotic drugs.

## STATE'S EXPERT EVIDENCE ON INSANITY

Dr. Tracy Gordy is a board-certified psychiatrist who, pursuant to court order, examined Moss for approximately one hour on June 29, 1984. Dr. Gordy testified extensively, not only about his observations of Moss during the interview, but also about schizophrenia and psychiatric diagnostic procedures in general. He concluded that Moss suffered from schizophrenia and did not know that his behavior was "inappropriate" at the time of its commission, although in retrospect he realized that it had been "inappropriate." (Dr. Gordy did not refer to Moss' behavior in terms of right and wrong during the interview; therefore, he never asked Moss if he knew that his behavior had been "wrong" as distinguished from "inappropriate.")

Prior to the interview, Dr. Gordy gave Moss the warning that anything he said could be used in court, and told Moss that he was there to see if he was mentally ill; Moss interjected that he was also there to determine whether he was so at the time "he committed the act," which seemed important to Moss. The doctor told Moss that he was correct. Moss told Dr. Gordy that he had burned the churches. At the time of the examination, Moss was alert, cooperative and oriented as to what the doctor was "to do" at their session. Dr.

Gordy testified that Moss was psychotic at the time of the fires, and not capable of conforming his conduct to the law. He later qualified that statement, however. On the one hand, he said that Moss was acting under the compulsion of his delusional thought system, but he also said that a person with Moss' symptoms would have the ability to *postpone* the commission of an offense, possibly up to a year or more. He tried to make the point that the postponement would have to make sense in the actor's delusional system, but he was not very successful in explaining that point in contrast to his statement about being able to postpone behavior.

Dr. Gordy described the examination process: the psychiatrist tries to determine whether the person's thought processes are logical or delusional; whether the affect and the intellect are appropriately integrated; and whether a person is oriented (knows where he is, the date, and why he is there). He explained that a determination of sanity is made on the basis of what the psychiatrist is told in the interview; that there was no specific test for a disorder such as schizophrenia; and, in regard to diagnosing someone as schizophrenic, "I guess you could call it an educated guess." Dr. Gordy's testimony then dealt with why schizophrenia was a mental illness. He testified extensively about the psychiatric publication *Diagnostic and Statistical Manual Number Three*. The first impression his testimony made was that schizophrenia is a mental disease because the D.S.M. III says it is. Disorders become included in the manual as diseases by a vote of psychiatrists, and that which is a disease in one edition may not be a disease in another edition, with one example being homosexuality. A different classification system is used in Europe, and it is easier to be classified as schizophrenic in the United States than in Europe. He also testified that fairly large numbers of the population of the United States suffer, at one time or another, maladies classified as diseases in the D.S.M. III, such as depression. Dr. Gordy admitted that it was possible to misdiagnose a person as having a mental disease and that it was possible for a psychiatrist to be fooled or misled by the subject; he had been by other subjects.

When asked if, during the interview, Moss made any statements that to Moss seemed logical, but to Dr. Gordy seemed illogical, he answered that the only thing Moss said as a direct statement to him that was illogical had to do with a very complex system of thinking that involved Moss' genealogy, whereby Moss believed he was descended from Caesar, who Moss believed was a messiah in addition to being Emperor. In Doctor Gordy's understanding of Caesar, he thought that Moss' "context" was illogical. Dr. Gordy said that in terms of what Moss was "dealing with" on the examination date, he was very logical and there was not anything other than the one comment that would indicate that his thinking was "off base."

If we go back in Moss' history, Doctor Gordy said, Moss described a very complex thought process which "to any of us would not have had a whole lot of meaning, although you could see threads of logic through it if you really thought it through carefully," (i.e., the basis of his genealogy, his involvement with trying to find out more about his family history and how irrational and illogical the steps that he took in order to trace that history were— such as leaving work because he felt he was "driven" to go to the library and pursue further some understanding of his family). Moss talked to him at length in a grandiose fashion about the importance of such activities, and said that in retrospect, he knew that the commission of the acts of arson was "inappropriate," although the acts seemed appropriate to him at that time because he needed to call attention in some way to his family history.

As noted, it was Dr. Gordy's opinion that at the time of the commission of the offenses, Moss was psychotic. When asked to explain what he meant by "psychotic," he said, "Maybe a better term, although it is not a medical term, is insane. The medical term psychosis means not in contact with reality." He was asked whether he was saying that "on or about July 4th,—in

other words, in retrospect you are saying that at that time he was psychotic or that he was insane?" His answer was "I think so." He said that, based on his conversation with Moss, Moss was incapable of conforming his conduct to the requirements of the law. He found Moss competent to stand trial as of June 29, 1984.

On re-direct examination, he reiterated that his examination involved only one hour with Moss, that Moss knew where he was, was alert, oriented as to time and place, and was not mentally retarded. Dr. Gordy testified, again, that Moss said that in retrospect, his conduct in burning the churches was "inappropriate," but at the time of the offenses, he thought it was appropriate. At the time of his examination Moss did not have hallucinations, nor did he claim to have any. He considered Moss' judgment fair.

Dr. Gordy was asked, "Could the fact that he [Moss] wanted the notoriety, money, fame, or publication of his book also be a motive [to burn the churches]?" He answered that Moss indicated to him that his motive was to call attention to his family's genealogy. Dr. Gordy admitted that a person could have a mental disease and yet not be insane. He was asked, "If there is evidence in a case that a person could travel and have interaction with the public and go to a family reunion and appear normal to every person there, could that be an indication that he has no control or an indication that he does have control in the decision making process?" He replied, "I think that would be an indication that he does have some control." He agreed that if a person hides the tool he used to commit a crime under a car seat to avoid detection, you could say that he knew he was wrong. He did not ask Moss what he did before and after the offense—he did not think it was important.

On further cross-examination, Dr. Gordy testified that at the time of his examination on June 29, 1984, Moss told him that he was taking Prolixin, a medication which is an anti-psychotic. Schizophrenia is caused by a disruption in the neurotransmitter dopamine. Prolixin blocks the amount of dopamine "being used," and therefore offsets the disruptive process. At examination, Moss had some characteristic signs that you see when a person is on a medication of the Prolixin type; and at trial, Moss had some of the same characteristics that the doctor saw at the examination, but since he had not seen Moss "move," he could not say whether he was on similar medication at the trial. He read from his report as follows: "When asked if he thought he was sick at the time he committed the acts he stated that he probably was. He stated that he knew he was not right and had not been right for approximately *two weeks to a month prior to the alleged offense.*" (Emphasis added).

Dr. Gordy said that it was a very short period of time that Moss was claiming to be psychotic, i.e., for approximately two weeks before the offenses to approximately a month after he was hospitalized. [The record shows that following the initial determination and judgment of incompetency he was committed to Rusk on *September 15, 1983*]. The doctor said Moss was not psychotic "at this time"—that schizophrenia is an illness where you may be psychotic, "but you don't have to be all the time." He was asked how he could determine that Moss was psychotic a year or more before the examination. His answer was, "On the basis of the history provided, that in this case he provided and on the basis of what motivated him to do certain things, and whether or not there is a logical kind of thing...." The doctor's impressions were subjective and based upon what Moss told him had happened more than a year earlier.

Dr. Sethurama Srinivasan of the Texas Department of Mental Health and Mental Retardation at Rusk Hospital examined Moss at Rusk during his commitment. Moss was not very cooperative during his examination, and was not willing to discuss the offenses. Both cooperation by the patient and background information are necessary for the psychiatrist to "prepare a diagnosis."

The doctor made multiple examinations of Moss between September 1983 and March of 1984. He was on medication,

Prolixin, a drug prescribed for treatment of schizophrenia. Moss was quite mentally ill when he came to Rusk, which is one reason he was not cooperative. With medication he improved, and became quite cooperative.

The doctor's final psychiatric evaluation on March 7, 1984, was that Moss was "generally" very cooperative, but not very cooperative in discussing "the case"; that as to Moss' mental activity, he was normal.

The doctor was not asked about insanity at the time of the commission of the offenses.

### STATE'S LAY WITNESSES ON SANITY

Following testimony of lay witnesses concerning the ownership and burning of the various churches, Eugene Bunton, Pastor of the Stephens Chapel A.M.E. Church in Milam County, testified that the church building was "set fire" on July 4, 1983. The building had a cornerstone, a stone slab set into the side of the building, which was intact prior to July 4, 1983, but subsequently had been removed by someone. He had met Moss twice, at church, within a couple of weeks or so before the fire. Moss was fully and appropriately dressed in a dark suit and did not appear to be drunk, on drugs, sick or hyperactive; "was real nice"; oriented, knew what he was doing and where he was; and was talking to others, and not a "loner." Moss said something about the river Nile [apparently as being in the vicinity]. Other than that remark, which the pastor did not understand, Moss was "real bright."

Sammie Charles Moore, a resident of Gause in Milam County, and a first cousin of Moss, testified as follows. He had known Moss practically all of Moore's life. Moss owns a rent-house in Milam County, and came to Milam County on occasion to check on the property. Moore saw Moss in March of 1983. Moss came by and visited with Moore all the time. On the occasion in March 1983, he and Moss went riding in Moore's car. Moss talked about having a book on family roots published, and said that he was trying to get people's attention and that he might have to burn a church "or do something." Moss said that he wanted the churches or church people to raise some funds or money for something he was doing (writing and publishing a book). Moore then said that he, Moore, "did not know about churches," but he believed that Moss wanted the church of which his mother was a member to raise funds. Moss told him that he might have to do something to get "those people" to listen to him—that he might have to burn churches to get their attention. [We note that this conversation occurred in March 1983, several *months* before the churches were burned in July. This would be at a time *before* he told the psychiatrist that he became mentally ill.]

Moore saw Moss on Sunday, July 3, in Milam County at a family reunion. They drove to Hearne, and talked about various things. Moss drove without difficulty, knew his way around, and carried on an intelligent conversation with Moore. Moore talked about girls, Moss about his book. They stopped at a club where Moss met and talked to his niece, Sabrina Moss. Moss and Moore were together from 9:30 p.m. until 12:30 a.m. Moss seemed like a normal person, "like he always was," to Moore. Moss told him that an "old-timer" had said that there was some money behind the cornerstone of a church (the Stephens Chapel A.M.E. Church, one of the churches burned). Moss told him that he was going to "check out" the "old-timer's" story. At the family reunion, there was beer of various brands, the major one being Michelob. Moss asked Moore for some brown paper bags. After the reunion, there was an ample supply of empty Michelob beer bottles.

Moore was with Moss on July 5. They drove to the rent-house where Moss unsuccessfully attempted to collect rent money owed him. They drove to the Perry Memorial church. A photographer from the *Rockdale Reporter* took their picture. They next went to Moore's aunt's house where they stayed about fifteen (15) minutes; then Moss, who was doing the driving, took Moore home, telling Moore that he was going to Houston. It was Moss'

decision to go to the Perry Memorial Church and to his rent-house. Moss seemed normal to Moore the morning of July 5th, and when he left for Houston. They visited Moore's aunt because it was a normal thing for Moss to visit all of his people when he came to Milam County.

On cross-examination of Moore, he testified that Moss had three brothers and six sisters. His mother, father and a sister all were killed. None of his brothers or sisters had mental problems. Every year Moss attended the family reunion. The first time that Moss mentioned his book was in 1983. He showed Moore some of the material for the book. Moss said there was lots of land around Milam County that was "messed up," that he was going to try to "get it straight," and that when he did so, Moore would have property to which he was entitled. Moore believed some of what Moss said, but did not believe other portions. Some of what Moss said made sense, "some of it didn't." Moss visited Milam County practically every week, and discussed the book and the property each week. To Moore, Moss appeared normal in such discussions, and Moore said "I think he was always the same guy to me." Moss seemed obsessed and compelled to talk about the property. Moss' discussion of the book did not seem strange to Moore, who said that "he [Moss] started the project, and it was up to him."

Moore did say that Moss did look different "now," (beginning on the first day that he was released from jail in August 1983). Moss came by Moore's house on the date of release; he acted as if he did not know Moore and looked strange as he did in the court room. He said that Moss was a different person on the date of trial from what he was on July 5th or July 4th. On those dates, when Moss was talking about burning churches, Moore told him that he should not do that, but drew no response. During this conversation, Moss *did not* look strange. Some of what Moss told him seemed crazy, some seemed real; more often than not it seemed crazy.

On re-direct, Moore again confirmed that Moss seemed normal in their conversations. He reiterated that Moss was normal during the "entire period" until he got out of jail. He said that when Moss got out of jail he had a beard—that he did not have one before.

Paul Young, a Houston car dealership employee, testified that he knew Moss in June and July, 1983, when they worked together selling cars. Moss was writing a book, and about the last of June to the first day of July said it was time to get it published, that he needed publicity to do so, and that there "was going to be some churches burned" to get the publicity. Young affirmed that his written statement said that Moss made the above statement on July 1, at which time Moss was off-duty. Young said that Moss was only known to him as Norris Eugene Moss, and was not known to him as Caesar, Jesus or Barbarossa.

On cross-examination, Young said that Moss referred to himself as Emperor and Caesar. Asked if he did not say in a statement that Moss was "ranting and raving" when he made those assertions, he said that Moss was not violent, but enthusiastic. Moss told him that he was writing a book about his family genealogy. He did not think there was anything strange in what Moss told him. He did *not* think Moss was insane. Moss was diligent, worked hard, and was obsessed with writing the book. Young knew Moss a year and a half before July 6, 1983. They were co-employees. In the court room, Moss did not look to Young the same as he did on July 2nd or 3rd, 1983. He said Moss was quite a bit "thinner," but other than that, he did look the same. Young did not think Moss would burn the churches; he said, "He's too nice a fellow." On re-direct, Young said that just before July 4, Moss appeared to be normal. During their 1½ years together, Moss was an excellent used car salesman and was skilled at convincing people. Moss' whole *modus operandi* and what he told Young he was going to do, was to get publicity for his book.

Edward T. Trein, pastor of Pinecrest Presbyterian Church in Houston, said that in June 1983, Moss came to him to present

a paper that he had been working on—a paper dealing with some of his concepts that he felt very strongly about. He asked for Trein's help in publishing the book, and getting a press conference to get some support. He wanted Trein to set up the conference with other ministers that Trein knew. Trein would not furnish publicity or support. Moss became upset and angry and left. On July 3, Trein received a call, went to his church and found that it had been burned.

On cross-examination, Trein said that prior to July 3, he saw Moss' material and read portions of it. It was historical material, not fully coherent in that it was in pieces and difficult to follow. Moss, however, was able to convey thoughts and organize them in a narrative form. There was historical and biblical material, which Moss tried to inter-relate. There was some logic to the writing, "if you could understand where he was coming from." At times Trein could understand what Moss was trying to get across; at other times he did not fully understand. He identified a paper of Moss' as one he had seen. The paper was left with Trein for review; several days later Moss picked it up. He and Moss discussed the paper. It was Trein's opinion that the material could be published, but it did not have a great deal of literary value, and he wanted nothing to do with its publication. Some of the material was written by Moss; other portions were photocopied from books. Moss was *sane* when Trein talked to him—Trein simply did not agree with Moss' ideas.

On re-direct, Trein said that the material shown to him by defense counsel was only a portion of what he had previously seen, and was not that which Moss presented to him when he asked for help in publication. The paper offered in evidence by counsel for Moss appeared to be a collection of reference material of the kind that one would collect before starting writing. Moss was able to put ideas together in narrative form, and to inter-relate historical and biblical material. Trein had known Moss for three years, during which time Moss communicated with him in normal fashion. Again, he said he did not think

Moss was insane. Based on Moss' work which Trein had seen and the fact that Moss brought him library material, he said Moss had considerable research skills, and knew how to use the library system quite well. A person with these skills would have access to psychiatric and psychological information. Trein had a degree in Divinity from Princeton, did graduate work, and had received training in counselling and psychiatric work. He felt that he could recognize some forms of mental instability. Asked if he would disagree if two psychiatrists said Moss was insane on July 4, 1983, he answered that he would disagree; that in his observation of Moss, he was not insane.

Ronald Turpin of Harris County worked with Moss in the automobile dealership in June 1983. He last saw Moss on July 3, 1983, at which time Moss said he was planning a vacation, was going to his home town of Hearne to "burn all the churches," and might or might not be back to work the next week; if not, "it would be known all over the nation."

On cross-examination, Turpin said that Moss told him he was God, the Emperor and Barbarossa, or something like that. He assumed this was a joke. Moss continually referred to himself as God. Moss said he was going to his hometown over the July 4th weekend, and that he would not be back. At first, Turpin denied saying that Moss told him that he was going to burn down some churches *and be in jail,* but having his memory refreshed by a written statement, he admitted that Moss did say *that he might be in jail.* Moss was "kind of strange like" and was not himself when he made the statements to Turpin before July 4th. Moss was different that day from what he had been two months before. He thought Moss was joking about "being God" and burning the churches. Moss did not appear the same in court—he was real calm, and "thinner." His facial expressions were worse than the last day Turpin saw him. On a few occasions other people had told Turpin that they were going to commit a crime—and did so. On re-direct, Turpin said Moss was

a good car salesman. The day Moss left, it looked like he had been taking medication.

Henry Horelica, a fire fighter for the City of Cameron testified that there were four (4) church fires in Milam County in 1983, all of which were the subject matter of the trial of Moss.

Joe Posival, an employee of the Cameron fire department and a certified fireman, was serving in relief of Horelica on July 4, 1983. About 3:00 A.M., the weekend of July 4th, he attended 3 fires in Gause, Milam County and one in the Hoyte community. He attended the fire in Hoyte first, then the Stephens Chapel A.M.E. Church in Gause. Glass from beer bottles was found at both fires. The next fire he attended was at the Zion Hill Baptist Church in Gause. Again, glass which appeared to be from beer bottles was found. The last fire was at the Church of God in Christ in Gause, where again glass from beer bottles was found. The fires appeared to have been started within 45 minutes of each other. He determined that the fires were set deliberately.

Bill Harris was deputy sheriff of Milam County on July 4, 1983. He investigated alleged arsons on the 4th of July 1983. A cornerstone had been removed from the Stephens Chapel A.M.E. Church. Where the cornerstone was removed, there were some beer bottles in the wall. He found some Michelob beer bottles at the Stephens Church, which were stuffed with paper and a flammable liquid; these were incendiary devices, commonly referred to as "Molotov cocktails." He had information that Moss might be involved in the fires and the investigation was turned over to Harris County arson investigators, following which Moss was arrested, and brought to Milam County. He advised Moss of his rights and asked if he wanted to make a statement. Moss indicated that he would make a statement but only in front of TV cameras and that he wanted a press conference.

Officer Lewis, an arson investigator with the City of Houston, having received a call from Milam County Deputy Sheriff Harris about the possibility of Moss being in-volved as an arsonist, went to the auto dealership where Moss worked. There he found that Moss was not on duty on July 4th. Having interviewed other employees, he believed that he had probable cause to arrest Moss. He waited until he knew that Moss had appeared at the used car lot, and he and other investigators, in two different cars, approached the lot. As they came into the lot, Moss left. They pursued Moss at a speed of 70 to 80 miles per hour. They traveled 10 to 15 miles before catching up with Moss. Later, after the arrest of Moss, he talked to him. Moss was oriented as to time, place and person. He dealt with Moss as he would a sane person and in his opinion Moss was sane. It was apparent that Moss was attempting to flee.

Officer Sammons, senior investigator with the Houston fire department, and an arson investigator, assisted in the investigation of the arsons in Milam County. He went to the car lot with the other officers. He had a description of Moss' automobile and a picture of him. He spotted the described vehicle with a person matching Moss' photo in it, pursued the car, and arrested Moss, who was oriented as to time and place. After being warned of his rights, Moss gave correct autobiographical information. The officer was experienced in interviewing disturbed persons. He treated Moss as a sane person; Moss appeared to be sane and rational.

When Moss was arrested, the officer was looking for flammable liquids, cotton balls, or anything that could be used to start a fire, and was looking for Michelob beer bottles. In the car Moss was driving, he found a portion of a bottle of alcohol, one partially used bottle and one full bottle of Pompeian Olive Oil, an open container of cotton balls, a Michelob six pack paper beer carton, and a variety of Moss' personal effects. The items which he found were consistent with what an arsonist might use to create incendiary devices. When he stopped Moss' car, Moss said, "I knew you were after me, I hoped I could stay away a little bit longer, I needed to get to the printer."

On cross-examination, the officer said Moss was rational, and that he appeared to be sane, basing his opinion on the manner in which Moss moved and acted at the time he was arrested. He appeared to be normal and rational, was able to carry on a conversation, and followed what the officer told him to do. In court, Moss appeared to the officer to be sedated. Moss was advised of his rights by a Harris County district judge, and was asked if he wanted to make a statement; he said he did not want to make a statement to the officer, but would like to talk to the news media. The news media appeared, but Moss refused to talk to them and said he wanted an attorney.

Having reviewed the evidence on the affirmative defense of insanity by looking at the evidence in the light most favorable to the implicit jury finding of sanity, we hold and determine that a rational trier of the facts could have determined that the appellant failed to prove his defense by a preponderance of the evidence. It is not our role to reweigh or reclassify the evidence. The issue is not strictly medical. Expert witnesses, although capable of giving opinion testimony that may aid the jury in determining the ultimate issue of insanity, are not determinative on that issue. Only the jury can join the non-medical testimony and components that must also be considered in deciding the ultimate issue. *See Graham v. State*, 566 S.W.2d 941 (Tex. Cr.App.1978). Jurors may believe or disbelieve expert witnesses as they choose. *Wade v. State*, 630 S.W.2d 418, 419 (Tex. App.1982, no pet.).

We affirm the judgments of conviction.